2012 Ark. 279

**In re Petition for Readmission of
Harold Wayne MADDEN to
the Arkansas Bar.**

**No. 12–345.**

Supreme Court of Arkansas.

Rehearing Denied Aug. 14, 2012.

June 21, 2012.

ROBERT L. BROWN, Justice.

This case involves an original petition filed by Harold Wayne Madden requesting readmission to the Arkansas Bar. We deny the petition.

On September 10, 1973, Madden was licensed to practice law in Arkansas. Almost three decades later, on July 5, 2000, Madden asked this court to accept the voluntary surrender of his law license. His petition at that time was filed in response to the Arkansas Supreme Court Committee on Professional Conduct's decision to initiate disbarment proceedings against him based on his federal felony conviction for one count of misprision of a felony. On July 13, 2000, on recommendation of the Committee on Professional Conduct, this court accepted the surrender of Madden's license and barred him from engaging in the practice of law in Arkansas. See In re Madden, 341 Ark. App'x 982, 22 S.W.3d 677 (2000) (per curiam).

On November 1, 2010, Madden filed an application with the Arkansas State Board of Law Examiners (the Board) seeking readmission to the Bar of Arkansas. In his application, he referred to the general rule that an application for readmission to the bar will not be accepted where the disbarment or surrender is the result of a conviction of a "Serious Crime." See Ark. Sup.Ct. P. Regulating Prof'l Conduct § 24(B)(2). He pointed, however, to the exception recognized in section 24(B)(2), where the crime committed involved the mental state of negligence or recklessness. See id. Madden maintained that although he pled guilty to misprision of a felony, a class E felony under federal law, which fits within the definition of a "Serious Crime," as defined by section 2(J) of the Arkansas Supreme Court Procedures Regulating Professional Conduct and would otherwise defeat his readmission under section 24, the crime committed by Madden involved the mental state of negligence or recklessness. He urged, accordingly, that his circumstances fall within the exception to the general rule barring reinstatement. The Executive Secretary of the Board referred Madden's application to the Chair of the Board, and the Chair concluded that he was unable to determine whether Madden was eligible for readmission. Madden then requested an evidentiary hearing on the petition in order to establish a record for a vote of the entire Board.

The evidentiary hearing was conducted on August 13, 2011, before a panel consisting of three members of the Board. In addition to testifying himself, Madden called several witnesses on his behalf, including former colleagues, friends, and his wife. According to his testimony at the hearing, by the early to mid–1990s, he was drinking alcoholic beverages excessively. Also, in 1996, he had begun associating with a younger group, which included people who drank heavily and used cocaine and other illegal substances. He admitted to drinking and using cocaine with these

individuals. This group included a former client of his, Jody Greenlee, and a secretary at his law firm, Shannon Steinmetz. According to Madden, he would stop at Greenlee's house on his way home from work because "it seemed like there was always a party going on there." He explained that "it became evident ... that there was some drug activity going on" but that he "turned a blind eye to it."

Madden testified that at some point during the 1990s, the Federal Bureau of Investigation (FBI) began to suspect Greenlee of small-time narcotics trafficking. As part of the investigation of Greenlee, FBI agents questioned Madden about his knowledge of and involvement with Greenlee's drug-related activities. During an interview with the FBI and an Assistant United States Attorney (AUSA) in late 1997, Madden told the agents about a transaction between Greenlee and Steinmetz, where Steinmetz purchased one ounce of cocaine from Greenlee. He also told the agents that he learned of the transaction when Greenlee informed him about it after it had happened.

The following is an account of the facts surrounding this transaction as prepared by the United States Attorney's Office in its Statement of Facts filed as part of the record in this matter:

> In the fall of 1996, Madden went to ... Greenlee's house with Steinmetz. Madden left the house before Steinmetz and later became aware that Greenlee sold one ounce of cocaine to Steinmetz on credit and that Steinmetz was going to use some of it and sell some of it. Steinmetz did not pay Greenlee the money for the ounce of cocaine quick enough and Greenlee complained to Madden about Steinmetz's slow payment.
>
> Madden was aware that one ounce of cocaine had been distributed by Greenlee to Steinmetz and Madden did not tell the police or anyone else about the crime.

According to the Statement of Facts, Greenlee, Steinmetz, and Madden all had admitted their involvement in this crime to the FBI. No charges were filed against Madden at the time he informed the FBI of his knowledge of this criminal transaction.

On November 4, 1997, prior to any charges being filed and while still under FBI investigation, Madden entered an alcohol-and drug-treatment program at The BridgeWay Hospital in North Little Rock. He stayed at the hospital for five days, and then entered into a sixteen-week outpatient program with his family. He continued to attend Alcoholics Anonymous (AA) meetings after completing his treatment at the hospital and ultimately handed over his law practice to another attorney.

The FBI's investigation of Madden continued, and in 1999, Madden testified that several of his employees, former clients, and colleagues were subpoenaed and questioned before a grand jury. In September 1999, Madden, through his attorney, set up another meeting with the FBI and the United States Attorney's Office. During this meeting, the AUSA informed Madden that if he pled guilty to misprision of a felony, a class E felony under federal law, based on his failure to report the drug transaction that had occurred between Greenlee and Steinmetz, and agreed to two years' probation and payment of a fine, then further investigation of him would cease. During his testimony at the Board hearing, Madden explained that the AUSA also informed him that if he did not plead guilty to misprision of a felony, he could be indicted on other more serious charges. Madden testified that he was concerned about being indicted on more serious charges, and said, "There were times when I went and bought drugs and we all went

out and partied on them, so ... that's a serious situation." Madden told the Board that he understood that possession of drugs would also be a felony charge.

On January 6, 2000, Madden pled guilty to one count of misprision of a felony, in violation of the Federal Criminal Code. *See* 18 U.S.C. § 4 (1996). On April 27, 2000, a judgment and commitment order was entered, sentencing him to two years' probation and ordering him to pay a $1000 fine and to attend AA meetings, as well as a second program sponsored by the Federal Probation Office, during the two-year probation period. Madden was also required to undergo drug-and-alcohol testing during his probationary period.

After surrendering his law license, Madden petitioned the Arkansas Real Estate Commission for permission to attend real estate school. It was granted, and Madden attended classes, sat for an examination, and in 2001, he received a sales license from the Real Estate Commission. Three years later he received his broker license from the Real Estate Commission, which remains current today. Sometime in 2007 or 2008, Madden began working as a freelance investigator with the Arkansas Public Defender Commission. A short time later, he was offered a part-time position with that Commission as an investigator and mitigation specialist, and he continues to hold that position today.

In support of his petition for readmission, Madden provided the Board with several letters of recommendation from current business associates and former colleagues in the legal community. Each person recommending him recognized Madden's efforts at recovery through active participation in AA and recommended reinstating his law license. Notably, Madden submitted a letter of recommendation from Didi Sallings, the Executive Director of the Arkansas Public Defender Com-

mission. In that letter, Sallings informed the Board that she would "gladly move him into an attorney's position when one becomes available," were his license to be restored. She concluded the letter by saying that "[w]hile [Madden] provides a valuable service to this office, in many ways his talents are being wasted," and by urging the Board to restore his law license.

Several witnesses also testified at the hearing in support of Madden's reinstatement, including Jim Hamilton, District Judge in the North Little Rock Criminal Division. Judge Hamilton testified that he had worked with Madden as an attorney and that Madden appeared before him after he had been elected to the bench. He stated that if Madden's license were reinstated, he believed Madden would be a competent attorney. Ron Oliver, the Director of the Arkansas Racing Commission, added his testimony in support of Madden's reinstatement. Oliver testified that he and Madden formed a real estate company approximately eight years ago, and he was aware of Madden's addiction to drugs and alcohol. He said that Madden is "very conscientious" about his treatment and attending AA meetings and that his "character and integrity are something that I think are unquestioned." Robert James, an attorney at the James, Carter and Coulter Law Firm, and Cathy Sullivan, a secretary at Hankins Law Firm, both testified that Madden's license should be reinstated.

As a final witness, Madden's wife, Sammie Lee Madden, testified to the changes she had seen in her husband since his conviction. She stated that, prior to his seeking treatment for his alcoholism, Madden drank every day and sometimes would not come home until the early hours of the morning. She testified that after surrendering his law license, he worked hard to

reinvent himself. She added that now Madden is a wholly different person. She concluded her testimony by saying, "We gave him a chance and he hasn't disappointed us, so . . . he deserves a chance" to get his license back.

The above testimony and evidence was presented to the panel of the Board at the August 13, 2011 hearing, and a record of the proceeding was prepared and submitted to the full Board. On April 9, 2012, the Board issued Findings and Conclusions where, by a vote of seven to four, it concluded that Madden was eligible for readmission to the Bar. The Board concluded that although Madden had been convicted of a felony, which fits within the definition of a "Serious Crime" and which would otherwise foreclose his readmission to the Bar, the crime committed by Madden involved the mental state of negligence or recklessness, and, therefore, his circumstances fell within the exception to the rule. The Board further found that Madden had been rehabilitated and successfully had established present mental and emotional stability and good moral character. The Board, as a result, recommended that Madden's license be reinstated. The Board cited no authority for its conclusions and findings. Madden now petitions this court for readmission to the Bar pursuant to Rule XIII(G) of the Arkansas Rules Governing Admission to the Bar, which provides in part that, upon a recommendation of readmission by the Board, the matter shall "be referred to the Arkansas Supreme Court for disposition, at its discretion. . . ."

Amendment 28 to the Arkansas Constitution expressly gives this court the authority to regulate the practice of law. *See* Ark. Const. amend. 28 ("The Supreme Court shall make rules regulating the practice of law and the professional conduct of attorneys at law."). |₈Amendment 28 was adopted in 1938 to make it absolutely clear that this court could make rules regulating both the practice of law and the conduct of attorneys. *In re Petition of Anderson*, 312 Ark. 447, 452, 851 S.W.2d 408, 410 (1993). The purpose of the amendment is to protect the public and to maintain the integrity of the courts and the honor of the profession. *Id.* We have also recognized that this court has the inherent power to discipline an attorney. *Id.*

The standards governing readmission to the Bar are settled and include the principle that the practice of law is a privilege and not a right. *In re Petition for Reinstatement of Lee*, 305 Ark. 196, 202, 806 S.W.2d 382, 385 (1991). A lawyer who has lost his or her license has the burden of proof at the readmission hearing. Ark. Bar Adm. R. XIII. Once a lawyer has lost his or her license to practice law, either through surrender or disbarment, there is a presumption against readmission. *Butcher*, 322 Ark. at 28, 907 S.W.2d at 717. This court has said that "[t]he overriding considerations on the question of readmission are the public interest, the integrity of the bar and the courts with due consideration to the rehabilitation of the petitioner with respect to good moral character and mental and emotional stability." *Anderson*, 312 Ark. at 452, 851 S.W.2d at 410 (quoting *In re Petition of Shannon*, 274 Ark. 106, 108–A, 621 S.W.2d 853, 855 (1981)). A position of trust, and sometimes an actual fiduciary relationship, exists in an attorney-client relationship. *Butcher*, 322 Ark. at 28, 907 S.W.2d at 718. For our legal system to function properly, a client must be able to have trust in his or her counsel, and it is the responsibility of this court to assure that the public can maintain that trust in the Bar. *Id.*

Section 24 of the Arkansas Supreme Court Procedures Regulating Professional Conduct provides as follows:

A. No attorney who has been disbarred or surrendered his or her law license in this State shall thereafter be readmitted to the Bar of Arkansas except upon application made to the State Board of Law Examiners in accordance with the Rules Governing Admission To The Bar, or any successor rules, and the approval of the Arkansas Supreme Court.

B. Provided, however, that application for readmission to the Bar of Arkansas shall not be allowed in any of the following circumstances:

(1) Less than five (5) years has elapsed since the effective date of the order of disbarment or surrender;

(2) The disbarment or surrender resulted from conviction of a Serious Crime in any jurisdiction other than commission of an offense for which the culpable mental state was that of negligence or recklessness; or

(3) Any of the grounds found to be the basis of a disbarment or any grounds presented in a voluntary surrender of law license are of the character and nature of conduct that reflects adversely on the individual's honesty or trustworthiness, whether or not the conviction of any criminal offense occurred.

Ark. Sup.Ct. P. Regulating Prof'l Conduct § 24 (2010).[1]

"Serious Crime" is defined in section 2(J) of the Arkansas Supreme Court Procedures Regulating Professional Conduct as:

*[A]ny felony* or any lesser crime that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or any crime a necessary element of which, as determined by the statutory or common law definition of the crime, involves interference with the administration of justice, false swearing, misrepresentation, fraud, deceit, bribery, extortion, misappropriation, theft, or an attempt, conspiracy or solicitation of another to commit a "serious crime."

Ark. Sup.Ct. P. Regulating Prof'l Conduct § 2(J) (2010) (emphasis added).[2] By its plain language, section 2(J) includes in the definition of "Serious Crime" any felony and "any lesser crime will constitute a 'serious crime' only if it reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer." *Ligon v. Stewart*, 369 Ark. 380, 386, 255 S.W.3d 425 [435], 440 (2007). Madden's conviction for misprision of a felony, a class E felony under

---

**1.** The Procedures Regulating Professional Conduct cited in this opinion are the versions of the rules in effect at the time Madden filed his petition for reinstatement on November 1, 2010. Amendments to the Procedures Regulating Professional Conduct were adopted by this court on May 26, 2011, and effective as of that same date. These amendments went into effect after Madden filed his petition for reinstatement but before the hearing was held and before the Board rendered its decision. These amendments did not change the substance of the procedures at issue in the instant case.

**2.** After the 2011 amendment, Section 2(J) now defines "Serious Crime" as follows: (1) any felony, (2) any lesser crime that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or (3) any crime a necessary element of which, as determined by the statutory or common law definition of the crime, involves interference with the administration of justice, false swearing, misrepresentation, fraud, deceit, bribery, extortion, misappropriation, theft or an attempt, conspiracy or solicitation of another to commit a "serious crime." The 2011 amendment does not affect this court's analysis of Madden's petition.

federal law, clearly falls within the definition of a "Serious Crime." Under the language of section 24, the only means by which Madden may be eligible to apply for readmission to the bar is if the "Serious Crime" for which he was convicted involves the mental state of negligence or recklessness. *See* Ark. Sup.Ct. P. Regulating Prof'l Conduct § 24(B)(2).

The Federal Criminal Code defines misprision of a felony as:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4 (1996).

The Supreme Court of the United States has discussed the obligations of citizens not to conceal crimes, first as a matter of common law and then as defined and enforced through the Federal Criminal Code. *See Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980) (citing 18 U.S.C. § 4). The Court in *Roberts* said:

> Concealment of crime has been condemned throughout our history. The citizen's duty to "raise the 'hue and cry' and report felonies to the authorities," *Branzburg v. Hayes,* 408 U.S. 665, 696, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), was an established tenet of Anglo–Saxon law at least as early as the 13th century. 2 W. Holdsworth, History of English Law 101–102 (3d ed.1927); 4 *id.,* at 521–522; see Statute of Westminster First, 3 Edw. 1, ch. 9, p. 43 (1275); Statute of Westminster Second, 13 Edw. 1, chs. 1, 4, and 6, pp. 112–115 (1285). The first Congress of the United States enacted a statute imposing criminal penalties upon anyone who, "having knowledge of the actual commission of [certain felonies,] shall conceal, and not as soon as may be disclose and make known the same to [the appropriate] authority...." Act of Apr. 30, 1790, 6, 1 Stat. 113. Although the term "misprision of felony" now has an archaic ring, gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship.

*Roberts,* 445 U.S. at 557–58, 100 S.Ct. 1358.

In commenting that the statute referenced in *Roberts* is still in existence today at Title 18, United States Code, Section 4, the Court observed that this statute has been construed to require "both knowledge of a crime and some affirmative act of concealment or participation." *Roberts,* 445 U.S. at 558, n. 5, 100 S.Ct. 1358 (quoting *Branzburg v. Hayes,* 408 U.S. 665, 696, n. 36, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)). Similarly, the majority of federal appellate courts, including the United States Court of Appeals for the Eighth Circuit, that have considered the offense of misprision of a felony have described the elements of that offense as (1) the principal committed and completed the felony alleged; (2) the defendant has knowledge of the fact; (3) the defendant failed to notify the authorities; and (4) the defendant took *affirmative steps to conceal the crime. See, e.g., United States v. Goldberg,* 862 F.2d 101 (6th Cir.1988); *United States v. Davila,* 698 F.2d 715 (5th Cir.1983); *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980); *United States v. Daddano,* 432 F.2d 1119 (7th Cir.1970); *Lancey v. United States,* 356 F.2d 407 (9th Cir.1966); *Neal v. United States,* 102 F.2d 643 (8th Cir.1939); *Bratton v. United States,* 73 F.2d 795 (10th Cir.1934) (emphasis added). These cases underscore that mere silence or failure to

report a crime is not sufficient to sustain a conviction for misprision of a felony, since there must be some positive act designed to conceal from the authorities the fact that a crime has been committed. *See, e.g., Davila,* 698 F.2d at 717; *Lancey,* 356 F.2d at 410.[3] Hence, it is clear that the modern interpretation of misprision of a felony, recognized by a majority of federal jurisdictions, including the Eighth Circuit in *Neal,* requires some affirmative or willful act of concealment as an element of the crime. It is equally clear that this affirmative-act-of-concealment element requires a mental state of something more than negligence or recklessness.

■ Madden recognizes that the federal statute under which he was convicted has been interpreted by various federal courts to require an affirmative step by the defendant to conceal the felony. He insists, however, that he did not possess a "sinister or evil intent" to commit the misprision of a felony, and that, instead, his behavior was due to some negligence or recklessness. He asserts that although he pled guilty to one count of misprision of a felony, he took no affirmative steps to conceal the crime. He further maintains, correctly, that the statement of facts prepared by the United States Attorney's Office contained no allegation that he took affirmative steps to conceal the crime. He adds that neither Greenlee nor Steinmetz was ever charged, much less convicted, of the underlying crime. He asserts, as a final point, that at his first meeting with the FBI and the AUSA, he not only told the truth but also informed the federal agents of everything he knew about the incident.

The information filed by the United States Attorney's Office asserts that Madden, "having knowledge of the actual commission of a felony ... *did conceal* and did not as soon as possible make known the same to some judge or other person in civil authority under the United States, in violation of Title 18, United States Code, Section 4." (Emphasis added.) However correct Madden may be in his assertion that there was no allegation that he took affirmative steps to conceal the crime, this does not change the fact that he pled guilty to the federal offense of misprision of a felony and is bound by that plea. As a result of this plea, a judgment and conviction order was entered in the United States District Court for the Eastern District of Arkansas, which is within the jurisdiction of the Court of Appeals for the Eighth Circuit. As already referenced, the Eighth Circuit is one of the federal jurisdictions that requires proof of affirmative steps to conceal the crime *as an element of the offense. See United States v. Bolden,* 368 F.3d 1032, 1037 (8th Cir.2004) (recognizing that the offense of misprision of a felony under 18 U.S.C. § 4 requires proof of "affirmative steps" to conceal a known felony) (citing *Neal,* 102 F.2d at 646).

In disbarment proceedings, a certified copy of the judgment of conviction is conclusive evidence of the attorney's guilt. *See* Ark. Sup.Ct. P. Regulating Prof'l Conduct § 15(c)(3) (2010). Furthermore, the attorney subject to discipline may not offer evidence inconsistent with the essential elements of the crime for which he or she was convicted. Ark. Sup.Ct. P. Regulating Prof'l Conduct § 15(c)(4); *see also Wilson v. Neal,* 332 Ark. 148, 159, 964 S.W.2d 199, 204–05 (1998) (holding that once Wilson was convicted in federal court, he was

---

**3.** There is one federal jurisdiction, the United States Court of Appeals for the First Circuit, that has not expressly adopted the affirmative-step requirement as an element of misprision of a felony. *See United States v. Caraballo–Rodriguez,* 480 F.3d 62, 70 (2007) (noting that none of that court's misprision-of-a-felony cases have adopted that element).

precluded from relitigating the elements of the crimes during the disbarment proceeding). Madden's request that this court consider the fact that he did not take affirmative steps to conceal this crime as evidence that his behavior involved the mental state of negligence or recklessness is a request that this court consider evidence that is inconsistent with the elements of the crime for which he pled guilty and was convicted. This is plainly prohibited by section 15(c)(4) of the Procedures Regulating Professional Conduct in disbarment proceedings, and this court concludes that this rule is equally applicable to proceedings for reinstatement or readmission to the Bar.

The language of section 24 is very clear that "application for readmission to the Bar of Arkansas shall not be allowed [where] ... [t]he disbarment or surrender resulted from conviction of a Serious Crime in any jurisdiction other than commission of an offense for which the culpable mental state was that of negligence or recklessness." Ark. Sup.Ct. P. Regulating Prof'l Conduct § 24(B) (2010). The rule speaks plainly and emphatically to the requirements that must be met before an applicant for readmission to the Bar even becomes eligible to apply for readmission. Because an affirmative act of concealment is an element of the offense of misprision of a felony, it cannot be said that the offense of misprision of a felony requires a culpable mental state of negligence or recklessness. As a consequence, Madden's conviction for misprision of a felony falls within the definition of "Serious Crime" and does not qualify under the exception set forth in section 24(B)(2).

Because Madden's application for readmission is prohibited under the language of section 24(B)(2) of the Arkansas Supreme Court Procedures Regulating Professional Conduct, it must be denied.

Petition denied.

CORBIN and DANIELSON, JJ., dissent.

PAUL E. DANIELSON, Justice, dissenting.

I respectfully dissent. As the majority correctly notes, the protection of the public and the honor and integrity of the profession have long been the principal criteria in determining whether a person should be admitted or readmitted to the bar. *See Redden v. Arkansas State Bd. of Law Exam'rs,* 371 Ark. 584, 269 S.W.3d 359 (2007). But in addition, this court gives due consideration to an applicant's rehabilitation. *See In re Petition of Anderson,* 312 Ark. 447, 851 S.W.2d 408 (1993).

While I am cognizant that Madden pled guilty to an offense for which the culpable mental state was not that of negligence or recklessness, I am simply unable to reconcile the outcome of this case with those in which we have permitted others to continue in the practice of law, where their actions more profoundly impacted both the public and the integrity of the profession. *See, e.g., Ligon v. Clouette,* 2011 Ark. 68, 378 S.W.3d 708. The ultimate issue in this case is the practice of law, of which we are charged with the regulation. *See In re Petition of Butcher,* 322 Ark. 24, 907 S.W.2d 715 (1995). Because I believe that Mr. Madden has demonstrated that he is deserving of readmission and I believe that the public trust and integrity of the profession would both be served by his readmission to practice, I believe it is fundamentally unfair to deny the instant petition.[1]

1. In addition, I believe the time has come for this court to reexamine its rules regarding sanction, disbarment, and readmission in an effort to address the disparity of treatment that often occurs from case to case.

Because I would grant the petition under the unique facts of this case, I respectfully dissent.

CORBIN, J., joins.